# In the United States Bankruptcy Court
# for the
# Southern District of Georgia
## Savannah Division

FILED
Lucinda B. Rauback, Clerk
United States Bankruptcy Court
Savannah, Georgia
By lbarnard at 4:40 pm, Apr 25, 2013

In the matter of: )
)  Chapter 11 Case
CHATHAM PARKWAY )
SELF STORAGE, LLC )
)  Number 12-42153
*Debtor* )

## OPINION AND ORDER ON DEBTOR'S MOTION TO USE CASH COLLATERAL FOR PAYMENT OF PROFESSIONALS

### FINDINGS OF FACT

Debtor filed this Chapter 11 case on November 2, 2012. Debtor is a Georgia limited liability company owned by Ben and Julie Farmer. Amended Disclosure Statement, Dckt. No. 161 at 1. A consent order confirming Debtor's status as a single asset real estate debtor was entered on January 24, 2013. Dckt. No. 77. Debtor owns a 4.92 acre tract of land in Chatham County, Georgia (the "Property"), upon which Debtor operates a self-storage facility. Stipulation of Undisputed Facts, Dckt. No. 157, Exh. A. Debtor's principal source of revenue consists of receipts from the rental of self-storage units. Since the petition date, Debtor has acted as a debtor-in-possession.

Ameris Bank ("Ameris"), successor in interest to Darby Bank & Trust Co., holds a first-priority security interest in the Property. Security Deed, Dckt. No. 57, Exh. 4. Ameris filed a proof of claim asserting that Debtor owed Ameris approximately

$7,600,000.00[1] as of the petition date. Claim No. 4; *see also* Note, Dckt. No. 57, Exh. 1-3. Interest on the Note is accruing at a rate of approximately $34,000.00 per month. The parties have stipulated that the Property is worth $6,000,000.00. Consent Order Stipulating Value, Dckt. No. 112. Accordingly, there is no equity in the Property.

Ameris's Security Deed includes a provision granting Ameris a security interest in all leases and rents and other proceeds of the collateral, including Debtor's accounts receivable and income generated by Debtor's operation of the Property. Security Deed, Dckt. No. 57, Exh. 4. The parties agree that these rents constitute cash collateral within the meaning of 11 U.S.C. § 363. Interim Consent Order, Dckt. No. 147 at 2, ¶ 6.

On November 2, 2012, Debtor filed a Motion to Use Cash Collateral. Dckt. No. 4. A Preliminary Consent Order Granting Authority to Use Cash Collateral was entered November 7, 2012, allowing Debtor to use Ameris's cash collateral for specified purposes until November 16, 2012. Dckt. No. 22. Three hearings were held on the cash collateral dispute before the parties filed an Interim Consent Order Authorizing Use of Cash Collateral through March 31, 2013. Dckt. No. 75. This Cash Collateral Order required Debtor to make monthly adequate protection payments of $17,000.00 and restricted the use of cash collateral to certain expenses set forth in an agreed upon budget, which was attached to the Order as Exhibit A. *Id.* On March 29, 2013, another Interim Consent Order Authorizing Use of Cash

---

[1] Except where the precise number is material, I will utilize rounded or approximate numbers throughout this opinion.

Collateral with similar terms to the previous order was entered to permit Debtor to use cash collateral, as specified in the budget at Exhibit A, through May 31, 2013. Dckt. No. 147.

The most recent Cash Collateral Order does not allow payment of professional fees except upon consent of Ameris or order of this Court. It states:

> Under no circumstance shall Debtor use Cash Collateral to make any payment to, or for the benefit of, any attorney, accountant, financial consultant, affiliate, insider, equity holder or beneficial owner of Debtor, or any relative of any principal of Debtor, without prior written consent of Ameris or upon motion and order of the Court, except as set forth on Exhibit A hereto.

Dckt. No. 147, ¶ 16(c). The Operating Budget at Exhibit A includes a line item for "Legal Fees," but the authorized amount for such line item is zero. *Id.* at Exh. A. Similarly, Exhibit A includes a line item for Debtor's financial advisor, Coastal Capital Advisor, Inc. ("CCA"), but the authorized amount for March, April, and May is zero. *Id.* The first Cash Collateral Order authorized a total of $9,000.00 to be paid to CCA, pursuant to an agreement by the parties. Dckt. No. 75. Testimony in earlier hearings indicated that CCA's services would no longer be necessary after a Plan was filed. Debtor also presented evidence that CCA's fees are within the industry standard.

Debtor filed a Chapter 11 Plan and Disclosure Statement on February 6, 2013. Dckt. Nos. 94 and 95. On March 12, 2013, Ameris objected to the Plan and Disclosure Statement. Dckt. No. 128. Debtor filed an amended Plan and Disclosure Statement on April

19, 2013. Dckt. Nos. 160 and 161.

On March 1, 2013, CCA filed an Application for Compensation and requested $3,600.00 for work performed through January 31, 2013. Dckt. No. 115. This amount is in addition to the $9,000.00 already paid pursuant to the previous Cash Collateral Order. Debtor's counsel, Merrill & Stone, LLC ("M&S"), has filed monthly statements of legal fees throughout the case in accordance with the Administrative Order under 11 U.S.C. §§ 105(a) and 331 Establishing Procedures for Interim Compensation and Reimbursement of Expenses for Professionals and Official Committee Members. Dckt. Nos. 37, 71, 109, 135, and 167.

On April 1, 2013, Debtor filed a Motion to Use Cash Collateral for Payment of Professionals. Dckt. No. 149. In this Motion, Debtor requests the ability to pay, out of Ameris's cash collateral, professional expenses to M&S and CCA up to $5,000.00 to each professional each month for actual expenses incurred for the previous calendar month. *Id.* at 2. Debtor proposes to grant Ameris a replacement lien on present and future rents from Debtor's self-storage facility as adequate protection for Ameris. *Id.*

A hearing was held on Debtor's Motion to Use Cash Collateral for Payment of Professionals on April 9, 2013. At the hearing Debtor argued that the Court should grant its Motion because Ameris's interest will be adequately protected. Debtor asserted that such

adequate protection is evidenced by (1) the payment to Ameris of $17,000.00 per month, as required by the Cash Collateral order, (2) the fact that Debtor's revenue has increased,[2] and (3) the replacement lien on present and future rents that Debtor proposes to grant Ameris. Conversely, Ameris argued that the professional fees are of no benefit to Ameris, and so Debtor cannot surcharge Ameris's collateral against these payments. Ameris also contended that a replacement lien in rents is insufficient adequate protection because Ameris's lien already extends to post-petition rents.[3]

After a review of the record in this matter, the Court now enters the following Conclusions of Law.

## CONCLUSIONS OF LAW

11 U.S.C. § 363(c)(2) states that the Debtor "may not use, sell, or lease cash collateral . . . unless (A) each entity that has an interest in such cash collateral consents; or (B) the court, after notice and a hearing, authorizes such use, sale, or lease in accordance with the provisions of this section." Because Ameris does not consent to this use of its cash collateral, the Court must decide whether to authorize the use of cash

---

[2] Evidence introduced at the hearing showed that Debtor's gross revenue for each month was as follows: November - $60,000.00, December - $53,000.00, January - $54,000.00, February - $59,000.00, and March - $61,000.00.

[3] Additionally, Ameris argued in its Limited Objections to CCA's Application for Compensation (Dckt. No. 115) and M&S's Fee Statements (Dckt. Nos. 71 and 109) that allowing cash collateral to be used for professional fees would violate the terms of the cash collateral order. Dckt. Nos. 110 and 156. However, the Cash Collateral Order provides that cash collateral may be used to pay professional fees "upon motion and order of the Court." See Dckt. No. 147 at 4, ¶16(c). Therefore, it is proper to consider this matter.

collateral for payment of professional fees.

If the Court authorizes use of the cash collateral, it must "prohibit or condition such use . . . as is necessary to provide adequate protection" of the secured creditor's interest in the property. 11 U.S.C. § 363(e); *see also* In re South Side House, LLC, 474 B.R. 391, 412 (Bankr. E.D. N.Y. 2012) ("Because the Rents are cash collateral, they may be used as provided in the Cash Collateral Order for as long as that order remains in effect. To the extent that the Debtor intends to use the Rents for purposes to which the Lender objects, such as the payment of professional fees and other administrative expenses, it will have to meet the standards of Sections 361, 363, and 552 to demonstrate that the Lender's interest is adequately protected.").

Under 11 U.S.C. § 361, adequate protection may consist of cash payments, a replacement lien to offset any diminution in the value of the collateral, or some other relief that provides the creditor with the "indubitable equivalent" of its interest in the property. The burden of proof is on Debtor to demonstrate Ameris is adequately protected for purposes of using its cash collateral. 11 U.S.C. § 363(p)(1).

Ameris contends that Debtor cannot use its cash collateral without showing that such professional fees will benefit Ameris or its collateral. Dckt. No. 110. Ameris cites § 506(c), which states that the Debtor "may recover from property securing

an allowed secured claim the reasonable, necessary costs and expenses of preserving, or disposing of, such property to the extent of any benefit to the holder of such claim, including the payment of all ad valorem property taxes with respect to the property." 11 U.S.C. § 506(c).

Administrative expenses and costs of reorganization generally cannot be surcharged against secured collateral. *In re* Dees Logging, Inc., 158 B.R. 302, 307 (Bankr. S.D. Ga. 1993) (Dalis, J.) (citing *In re* Saybrook Manufacturing. Co., Inc., 130 B.R. 1013, 1021 (Bankr. M.D. Ga. 1991)). Section 506(c) is an exception to that general rule. *In re* Trim-X, Inc., 695 F.2d 296, 301 (7th Cir. 1982) ("An exception to that general rule has been recognized, however, when expenses of preservation are incurred primarily for the benefit of the secured creditor or where the creditor caused or consented to such expenses . . . That exception has been codified in section 506(c)."). The individual with standing to seek compensation under § 506(c) has the burden of proving that "the costs, expenses, or services: 1) were reasonable; 2) were necessary; and 3) were of benefit to the secured creditor." *In re* Swann, 149 B.R. 137, 143 (Bankr. D. S.D. 1993) (citing French Market Homestead, FSA v. P.C., Ltd., 929 F.2d 203, 204 (5th Cir. 1991)).

However, in *In re* Proalert, LLC, 314 B.R. 436 (B.A.P. 9th Cir. 2004), the panel found that a bankruptcy court did not have to find, prior to allowing a Chapter 11 debtor to use an undersecured creditor's cash collateral in order to pay professional

fees, that such payments were reasonable and necessary and would provide a quantifiable benefit to creditor, in accordance with requirements for surcharge. The court held that it was sufficient that the debtor provided adequate protection for the creditor's security interest. Proalert, LLC, 314 B.R. at 444-45. The panel explained that "[n]othing in § 363 prohibits using cash collateral to pay estate professionals or conditions the use on satisfaction of the test applicable for a surcharge under § 506(c)." Id. at 441. Similarly, another court distinguished "surcharge" from using cash collateral to pay professional fees:

> The Court likewise rejects Travelers' contention that the debtor cannot use its collateral to pay professional fees. As noted earlier, and as held by the District Court in this case, the debtor can use collateral, even cash collateral, as long as the secured creditor's interest is adequately protected. The only limitations upon this right are those found in § 363. Contrary to Travelers' position, § 506(c) does not compel a different conclusion. That section sets forth the conditions upon which a secured creditor's collateral can be surcharged. *Yet, the use of Travelers' cash collateral to pay the debtor's professional fees does not constitute a surcharge.*

In re Coventry Commons Assoc., 149 B.R. 109, 114 (Bankr. E.D. Mich. 1992) (emphasis added). These courts have held that the relevant inquiry is whether there is adequate protection, not whether the creditor is receiving a quantifiable benefit. Proalert, LLC, 314 B.R. 436; Coventry Commons Assoc., 149 B.R. 109; In re General Auto Bldg., LLC, slip copy, 2012 WL 6737741 (Bankr. D. Or. 2012) ("Debtor seeks to pay its appraiser from P & F's cash collateral, which is governed by § 363, not § 506(c). Section 363 requires

adequate protection, not benefit to the creditor.") (citation omitted). I agree with these decisions.

Accordingly, I will proceed to determine whether Ameris's interest is adequately protected. In determining whether an offer of adequate protection is sufficient the court must:

> (1) establish the value of the secured creditor's interest, (2) identify the risks to the secured creditor's value resulting from the [debtor's] request for use of cash collateral, and (3) determine whether the [debtor's] adequate protection proposal protects value as nearly as possible against risks to that value consistent with the concept of indubitable equivalence.

*In re* Polaroid Corp., 460 B.R. 740, 743 (B.A.P. 8th Cir. 2011).

Here, Debtor proposes to grant as adequate protection a replacement lien on the Debtor's present and future rents from its self-storage units. Dckt. No. 149. Section 552 governs the postpetition effect of a security interest. 11 U.S.C. § 552. This provision provides that "if the debtor and an entity entered into a security agreement before the commencement of the case and if the security interest created by such security agreement extends to . . . amounts paid as rents of [the debtor's] property . . . then such security interest extends to such rents . . . acquired by the estate after the commencement of the case to the extent provided in such security agreement . . . ." 11 U.S.C. § 552 (b)(2). Here, the Security Deed grants Ameris a security interest in "all Rents accruing [from the

9

Property], whether now or hereafter due." Security Deed, Dckt. No. 57, Exh. 4. Therefore, Ameris possesses a security interest in the rents produced by the Property, including the postpetition rents. The value of the this interest is measured by the actual rents that have accrued or will accrue. Putnal v. SunTrust Bank, 2013 WL 1296766, at *3 (M.D. Ga. 2013).

The majority of courts to consider the issue have deemed a security interest in rents to be wholly separate from a creditor's security interest in property, and therefore, requiring of separate adequate protection. *See In re* Buttermilk Towne Center, LLC, 442 B.R. 558 (B.A.P. 6th Cir. 2010); Putnal, 2013 WL 1296766; *In re* River Oaks Ltd. P'ship, 166 B.R. 94 (E.D. Mich. 1994); *In re* Griswold Building, LLC, 420 B.R. 666 (Bankr. E.D. Mich. 2009). In Buttermilk Towne Center, the debtor moved to use an undersecured creditor's cash collateral to pay professional fees and proposed to grant the creditor a replacement lien in rents. Buttermilk Towne Center, 442 B.R. 558. The creditor objected, arguing it was not adequately protected. *Id.* The Bankruptcy Appellate Panel held that a replacement lien in rents did not provide adequate protection to the creditor for the debtor's use of rents as cash collateral to pay professional fees, concluding that a replacement lien in future rents offers no adequate protection because the lender's lien already extends to those rents. *Id.* Likewise, in River Oaks, the court held that "[w]here . . . there is a specific assignment of rents given as security, a diversion of any portion of the rents to a party other than the secured party is clearly a diminution of the secured party's

interests in the assignment of rents portion of the security . . . The secured party has a security interest in the full amount of the future rents. Therefore, this Court cannot accept that the use of future rents to replace the expenditure of the prior months rents somehow provides adequate protection for the secured party." River Oaks, 166 B.R. at 99.

The court in Griswold Building concluded similarly in a plan confirmation context, finding that an undersecured lender had separate interest in real property and in rents, and a Chapter 11 plan that failed to pay any of those rents to the lender, but instead used the rents to pay professional fees, unsecured claims, and operating cash flow shortages was not fair and equitable. Griswold Building, 420 B.R. 666; *see also In re* Las Torres Development, LLC, 413 B.R. 687, 696-97 (Bankr. S.D. Tex. 2009) (finding it "disingenuous to argue that the Debtors can grant replacement liens to the Lender on post-petition rents . . . because the Lender already has a lien on the Rents," but holding that the creditor's substantial equity cushion[1] provided adequate protection for use of cash collateral); *In re* Union-Go Dairy Leasing, LLC, 2010 WL 1848485, at *4 (Bankr. S.D. Ind. 2010) ("Because AgStar already has a postpetition lien in the Rents, the Debtor's argument that it can offer AgStar a replacement lien in postpetition Rents as adequate protection for the use of such Rents is not well taken. The Debtor simply cannot give

---

[1] An equity cushion in property may provide a creditor with adequate protection of its interest sufficient to allow debtor to use creditor's cash collateral. *In re* May, 169 B.R. 462, 472 (Bankr. S.D. Ga. 1994) (Davis, J.). Here, the parties have agreed that the value of the property is $6,000,000.00. Ameris's claim is greater than that amount, and therefore there is no equity cushion in this case.

AgStar a replacement lien in the Rents where AgStar's interest in such postpetition Rents was already fully secured by virtue of § 552(b) of the Bankruptcy Code").

Conversely, in *In re* Wrecclesham Grange, Inc., 221 B.R. 978, 981 (Bankr. M.D. Fla. 1997), the court found that "as long as the debtor generates a continuous income stream, the debtor's use of the rental income does not diminish the value of the collateral . . . The rationale is that the protected cash proceeds are being used to generate new collateral which will be of at least equivalent value of those replaced." Debtor argues that the Wrecclesham Grange approach should be taken in this case, particularly as Debtor's revenue has increased over the past few months. The Wrecclesham Grange opinion is well-considered and articulate, yet in the intervening years the weight of authority has not supported its holding.

I now follow those cases concluding that a replacement lien in rents is illusory because § 552(b) already gives the creditor a lien on postpetition rents. I also agree with the vast majority of courts to consider the issue that a security interest in rents is separate from a creditor's security interest in property, and therefore requires separate adequate protection. The value of a creditor's interest in rents is measured by the rents actually generated. Putnal v. SunTrust Bank, 2013 WL 1296766, at *5 (M.D. Ga. 2013). Thus, even with a continuous income stream, Debtor's use of cash collateral to pay

professional fees will diminish Ameris's interest because Ameris has a lien on Debtor's entire income stream, not just a fixed amount. As the court in Putnal explained,

> [The creditor] has a secured interest in each dollar in rents that accumulates, and each of those dollars is entitled to adequate protection. The Debtor may not use any of the rents to administer his bankruptcy or for other general purposes, because for each dollar in rents he spends, he deprives [the creditor] of the adequate protection of that dollar. The Debtor's use of rents is therefore limited to expenses that are "directly related to the operation, maintenance, or preservation of the" [Property], or that "are reasonable and necessary to preserving or disposing of such property and are incurred primarily for the benefit of the secured creditor."

Id. (quoting In re River Oaks Ltd. P'ship, 166 B.R. 94, 99-100 (E.D. Mich. 1994)). A replacement lien in future rents, like the Debtor here proposes to grant, is insufficient to provide Ameris adequate protection.[2]

However, as Putnal states, adequate protection is afforded by the use of cash collateral for expenses "directly related to the operation, maintenance, or preservation" of the Property. Id. Thus, the rents that may not be utilized without adequate protection are not the gross amount, but the net, after deduction of expenses directly related to such operation, maintenance, or preservation. See In re May, 169 B.R. 462, 472 (Bankr. S.D. Ga. 1994) (Davis, J.) ("There has been no suggestion that Debtors are willing or capable of making any cash payments or providing for a replacement lien to compensate California Federal for the decrease in value . . . The only way to adequately protect California Federal's interest in the

---

[2] The Court notes that a replacement lien in *unencumbered* property would require a different result.

13

rents, absent relief from stay, is to require Debtors to segregate all rents in a separate account and strictly limit the use of the rents to the costs and expenses which are directly related to the maintenance of [the property].")

Debtor contends that its payment of $17,000.00 per month Debtor to Ameris as part of the Cash Collateral Order is sufficient to adequately protect Ameris's collateral and still permit payment of professional fees. Ameris is undersecured, and therefore does not receive postpetition interest on its claim. *See* 11 U.S.C. § 506(b). The cash collateral payment equals about half of the contract interest that accrues monthly under the loan documents. Ameris contends that the $17,000.00 is a negotiated amount that includes the bargained-for provision restricting the payment of professional fees. Ameris argues that it only agreed to this amount with the caveat that no professional fees would be paid out of Ameris's cash collateral. Debtor responds that Ameris agreed to that amount coupled with the possibility that the Court could authorize payment of professional fees from cash collateral.

I agree that this $17,000.00 monthly payment provides adequate protection. Adequate protection is intended to "safeguard the creditor against depreciation in the value of its collateral during the reorganization process." *In re* Weinstein, 227 B.R. 284, 296 (B.A.P. 9th Cir. 1998). Because Debtor seeks to use up to $5,000.00 per month each for CCA

and M&S, Debtor needs to demonstrate that Ameris is adequately protected for up to $10,000.00 per month in professional fees, as that is the amount by which the value of Ameris's interest in net rents would decline. *See In re* SI Grand Traverse, LLC, 450 B.R. 703, 706 (Bankr. W.D. Mich. 2011) ("According to the Debtor's projections, the Debtor expects to spend $309,754.00 of cash collateral . . . Because Congress has specified in 11 U.S.C. § 552(b)(2) that CB 2010's pre-petition lien extends to post-petition rents, the court concludes that the cash collateral to be protected . . . includes rents in the amount that the Debtor proposes to expend during this period, namely $309,754.00.").

Whether a creditor is adequately protected pursuant to § 363 is a case-by-case analysis based on factors such as whether the value of the security exceeds the debt or whether there is a reorganization plan that provides for full payment to the creditor. *In re* River Oaks Ltd. P'ship, 166 B.R. 94, 98 (E.D. Mich. 1994); *In re* South Side House, LLC, 474 B.R. 391, 408 (Bankr. E.D. N.Y. 2012) ("Whether a creditor is adequately protected depends on the facts and circumstances of the case."); *see also In re* LDN Corp., 191 B.R. 320 (Bankr. E.D. Va. 1996) (denying motion to use cash collateral where debtor had no prospect of reorganization and where debtor had no prospect of replenishing any of the cash collateral for months).

Although Debtor's proposed "replacement lien" on rents cannot provide adequate protection, Debtor's monthly adequate protection payment of $17,000.00, which matches the prepetition partial interest payment, is sufficient. This payment, which is not legally mandated for an undersecured creditor under Timbers, provides sufficient adequate protection for payment of professional fees during the time period before the Court can adjudicate Ameris's Motion for Relief from Stay or rule on confirmation. *See* United Savings Ass'n of Tex. v. Timbers of Inwood Forest Associates, Ltd., 484 U.S. 365 (1988) (undersecured creditor not entitled to interest on its collateral as compensation for delay caused by automatic stay in foreclosing on collateral).

The vast majority of the expenses[3] for which Debtor is currently using cash collateral under the terms of the Cash Collateral Order are expenses directly related to the operation, maintenance, or preservation of the Property, and thus do not require adequate protection.[4] Therefore, a portion of the non-mandatory $17,000.00 monthly payment can, in effect, be considered a cash payment sufficient to provide adequate protection for the encroachment on rents to pay professional fees. Debtor's revenue has remained stable, and appears to be trending upward. Debtor has filed a Plan of Reorganization and Disclosure Statement, which will be scheduled for a hearing in the near future. While it is too soon to

---

[3] For example, there are line items on the parties' Cash Collateral budget for taxes, insurance, repair and maintenance, and utilities, among others. Cash Collateral Order, Dckt. No. 147, Exh. A.

[4] Under § 506(c) these payments would be permitted as a surcharge under a "benefit to the creditor" analysis.

assess whether that Plan will be confirmed so that an effective reorganization can be achieved in a reasonable time, it does appear that there is a realistic reorganization in prospect. *Cf.* LDN Corp., 191 B.R. at 327 ("We have found that a reorganization is not in prospect and simply using up the collateral of NationsBank is not acceptable.").

For all of these reasons, I find that Debtor has met its burden of establishing adequate protection of Ameris's interest in cash collateral for the interim period before the Court can rule on confirmation and/or Ameris's stay relief motion. Debtor will be permitted to pay professional fees of up to $5,000.00 per month each for M&S and CCA out of Ameris's cash collateral, subject to Court review of any objection on a ground other than adequate protection. Such allowance will continue as appropriate until confirmation and/or Ameris's stay relief motion is resolved, or until further Order of this Court.

## ORDER

Pursuant to the foregoing, IT IS THE ORDER OF THIS COURT that Debtor's Motion to Use Cash Collateral for Payment of Professionals is GRANTED on an interim basis. Debtor is permitted to use cash collateral to pay professional fees up to $5,000.00 each,

as limited above, for M&S and CCA pursuant to the terms of Debtor's Motion, pending further Order of this Court.

_____
Lamar W. Davis, Jr.
United States Bankruptcy Judge

Dated at Savannah, Georgia
This 25th day of April, 2013.