# In the United States Bankruptcy Court
## for the
### Southern District of Georgia

Savannah Division

**FILED**

Lucinda B. Rauback, Clerk
United States Bankruptcy Court
Savannah, Georgia
By lbarnard at 4:31 pm, Mar 03, 2014

In the matter of:             )

                                 )        Chapter 11 Case

CHATHAM PARKWAY    )

SELF STORAGE, LLC      )

                                 )        Number 12-42153

                 *Debtor*      )

## OPINION AND ORDER
## ON MOTION TO COMPEL EXECUTION OF LOAN DOCUMENTS

Chatham Parkway Self Storage, LLC ("Debtor") filed its Chapter 11 case on November 2, 2012. Dckt. No. 1. On November 1, 2013, Debtor filed this Motion to Compel Execution of Loan Documents ("Motion") as contemplated by its plan of reorganization. Dckt. No. 264. After a hearing on the merits on December 11, 2013, followed by extensive negotiations and a second hearing on February 3, 2014, I enter the following Findings of Fact and Conclusions of Law.

### FINDINGS OF FACT

On November 2, 2012 (the "Petition Date"), Debtor filed a voluntary petition under Chapter 11. Dckt. No. 1. Debtor is a Georgia limited liability corporation owned by Ben and Julie Farmer. Amended Disclosure Statement, Dckt. No. 161. Debtor owns a 4.92 acre tract of land in Chatham County, Georgia (the "Property"). Stipulation of Undisputed Facts, Dckt. No. 157, Exh. A. Since the Petition Date, Debtor has operated as a

AO 72A
(Rev. 8/82)

debtor-in-possession, collecting rents from a self-storage facility located on the Property. Dckt. No. 4.  Ameris Bank ("Ameris" or the "Bank"), successor in interest to Darby Bank & Trust Co.("Darby"), is the transferee and assignee of a loan document executed by Debtor in favor of Darby and holds a first-priority interest in the Property. Dckt. No. 57.

Debtor filed its first Plan of Arrangement on February 6, 2013. Dckt. No. 94. Ameris filed an objection to the plan on March 12, 2013. Dckt. No. 128. Debtor filed an Amended Plan of Arrangement on April 19, 2013, to which Ameris also filed an objection. Dckt. Nos. 160, 201. The parties submitted to mediation on June 4, 2013, with the Honorable John S. Dalis, at which time a settlement was reached. Dckt. No. 215. Debtor incorporated the mediated settlement through an addendum attached to its Second Amended Plan of Arrangement filed June 19, 2013. Dckt. No. 218. The Second Amended Plan was later withdrawn by Debtor on June 26, 2013, and resubmitted with minor changes that same day. Dckt. Nos. 223, 225. The resubmitted Second Amended Plan of Arrangement (the "Plan") was ultimately confirmed by the Court on July 22, 2013. Dckt. No. 242.

Paragraph Five (5) of the Addendum to Second Amended Plan of Reorganization (the "Addendum") states:

> By no later than the effective date of the Plan, the Debtor agrees to execute new loan documents in favor of Ameris which govern the terms of its repayment of Ameris' secured claim as set forth in the Plan (as amended hereby), as well as the security for the indebtedness represented thereby (the "Secured Claim Loan

Documents"). Ameris shall provide to the Debtor for review the Secured Claim Loan Documents not less than fifteen (15) days prior to the effective date of the Plan. The Secured Claim Loan Documents shall include, without limitation, provisions requiring the Debtor to deliver to Ameris:

a. Annual tax returns of the Debtor and all guarantors;
b. Annual personal financial statement for all guarantors;
c. Monthly profit and loss statements, balance sheets and site inspection reports (to be delivered quarterly); and
d. Other financial documents that are reasonable and customary for a commercial loan of this nature.

Addendum to Second Amended Plan of Reorganization, Dckt. No. 225. Pursuant to the terms of the Plan, the effective date of the Plan, and therefore the deadline for executing the Secured Loan Documents ("Loan Documents"), was September 6, 2013. Dckt. No. 256. The Court extended the deadline for Debtor to execute the Loan Documents from the effective date to September 13, 2013, due to Ameris providing the Loan Documents for review on August 27, 2013, some five (5) days after the August 22, 2013, deadline. *Id.*

Sometime after reviewing the Loan Documents provided by Ameris, Debtor submitted its own version of the Loan Documents to the Bank for execution. Dckt. No. 264. Because the parties could not agree on all the specific terms included in the Loan Documents, Debtor filed this Motion on November 1, 2013. *Id.* In the Motion Debtor asks the Court to compel Ameris to execute the Loan Documents as drafted by Debtor, or in the alternative, direct further mediation with Judge John S. Dalis, or in the alternative, hold a hearing and determine the appropriate terms to be included in the Loan Documents. *Id.*

CONCLUSIONS OF LAW

11 U.S.C. § 1142 governs implementation of a Chapter 11 plan, and subsection (b) of that section states in relevant part:

> The court may direct the debtor and any other necessary party to execute or deliver or to join in the execution or delivery of any instrument required to effect a transfer of property dealt with by a confirmed plan, and to perform any other act . . . that is necessary for the consummation of the plan.

"[P]ostconfirmation jurisdiction pursuant to § 1142(b) is generally restricted to protecting the confirmation order, . . . and aiding in the plan's execution." Beal Bank, S.S.B. v. Jack's Marine, Inc. (In re Beal Bank, S.S.B.), 201 B.R. 376, 379 (E.D. Pa. 1996)(citing In re Greenley Energy Holdings of Pennsylvania, Inc., 110 B.R. 173, 180 (Bankr. E.D. Pa. 1990); In re Dilbert's Quality Supermarkets, Inc., 368 F.2d 922, 924 (2d Cir. 1966)). One example of an application of § 1142 is "if the plan provides that a claim is to be secured by property of the estate, the court can order the debtor or such other person as may be necessary to execute a security agreement, mortgage, or similar instrument." 8 Collier on Bankruptcy ¶ 1142.03 (16th ed. rev.2013). Clearly if a court has the authority to order a party to execute an instrument simply because the plan calls for a claim to be secured by property of the estate, it would have that same authority to aid in a plan's consummation by ordering the execution of an instrument expressly called for by the plan. As mentioned *supra*, the

Addendum expressly states that Debtor will execute the Loan Documents in favor of Ameris based on the terms of repayment set forth in the Plan.

However, there are instances where courts refused to order the execution of an agreement referred to in the plan because the material terms of the agreement were not included in the plan. In re Modern Steel Treating Co., 130 B.R. 60, 65 (Bankr. N.D. Ill. 1991)("Neither the Plan itself, nor usage and custom aid the Court in determining what understanding, if any, the parties had reached. The document the [shareholders] ask us to require [another shareholder] and the Debtor to sign contains many conditions and requirements that are not mentioned in either the Plan or the Disclosure Statement, and are not necessary or even helpful to the Plan").

Modern Steel is easily distinguishable from the case before the Court. Here, Debtor drafted four iterations of the Plan and an Addendum before the terms of repayment were sufficiently detailed and acceptable to both Ameris and Debtor. Moreover, the final terms and conditions were the direct result of a mediated settlement between the parties. The Addendum and other provisions of the Plan set forth the material terms of the loan repayment. They include such items as the secured claim amount, retention of the existing lien, treatment of the twelve (12) initial interest only payments, treatment of the remaining amortized payments, payment due dates, interest rates, final balloon payment, effects of prepayment, responsibilities of the guarantors, and consequences of default. Dckt. No. 225. Including such detailed material terms of repayment in the Plan coupled with a provision

requiring the parties to execute Loan Documents based on these terms sufficiently demonstrates to the Court what understanding the parties reached. Therefore, I find that the Court has the authority under § 1142(b) to direct the parties to execute the Loan Documents to protect the confirmation order and aid in the plan's execution.

The Court will now address the disputed terms and conditions contained in the exchanged versions of Loan Documents which are the subject of this Motion. As discussed *supra*, the confirmed Plan contains sufficient agreed-upon material terms to infer a meeting of the minds between the parties and a willingness to be bound by Loan Documents incorporating these terms. However, it is not reasonable to expect a plan of reorganization in bankruptcy to contain the amount of minute detail that is typically found in commercial loan documents. Presumably, this is why the Addendum called for the parties to execute Loan Documents after confirmation.

"[A] bankruptcy court may clarify a plan where it is silent or ambiguous." Beal Bank, 201 B.R. at 380 (*citing* United States for the Internal Revenue Service v. APT Industries, Inc., 128 B.R. 145, 146 (W.D.N.C. 1991). Moreover, "[b]ankruptcy courts can also use this authority to "interpret" plan provisions to further equitable concerns." Beal Bank, 201 B.R. at 380. In Beal Bank, the debtor and Resolution Trust Corporation ("RTC") began negotiations to modify the terms of repayment of its claim shortly after the bankruptcy court confirmed the debtor's plan of reorganization. *Id.* at 378. During the negotiations, RTC

agreed to assign its mortgage to Bombardier, a third party, upon satisfaction of its claim by Bombardier and the debtor, yet nothing from the negotiations was incorporated into the confirmed plan. *Id*. Before repayment of the claim, RTC sold the loan documents to Beal Bank. *Id*. Later, there was some dispute regarding the agreed-upon terms from the negotiations, and Beal Bank refused to assign the mortgage to Bombardier. *Id*.

"The dispute over the terms of the agreement had already delayed payment of the claim; without court intervention the confirmed plan . . . would have failed." *Id*. at 379. In affirming the bankruptcy court's order requiring Beal Bank to assign its mortgage interest to Bombardier upon payment of its claim, the district court held that the order was "an exercise of [the bankruptcy court's] continuing authority to supervise the plan. This requirement did not alter any provision of the Plan. Instead, the Court clarified the Plan on a matter on which it was silent." *Id*. at 380; *see also* APT Indus., Inc., 128 B.R. at 147 (holding that the bankruptcy court's order requiring the IRS to apply payments by the debtor to trust fund taxes first "did not change any material terms of the plan, but instead clarified the plan where previously it had been silent); In re Collins, 184 B.R. 151, 154 (Bankr. N.D. Fla. 1995)(allowing a "commercially reasonable" post-confirmation interest rate of 8% where the debtor's plan "[did] not expressly provide for, or preclude, the payment of post-confirmation interest to the IRS").

Here, the Plan is silent on the disputed terms and conditions that are the

subject of this Motion. A court order supplying these missing terms and conditions would in no way alter a material term or provision of the confirmed Plan. "A confirmed plan of reorganization operates as a contract between a reorganized debtor and its creditors." In re Friedman's, Inc., 356 B.R. 758, 765 (Bankr. S.D. Ga. 2005)(Davis, J.). What is clear from this contract between Debtor and Ameris is that the parties desired and expected to execute Loan Documents, which at a minimum, contain the specific material terms outlined in the Plan. Moreover, because the extended deadline for executing the Loan Documents has passed, the parties are arguably in default of the Plan/contract. Therefore, I find that in order to protect the confirmation order and aid in the Plan's execution, the Court has the authority to supply commercially reasonable terms and conditions to the Loan Documents where the Plan is silent and which do not alter any provision of the Plan.

I conclude that the Court has the authority under § 1142(b) to direct the parties to execute Loan Documents based on the agreed-upon terms and conditions included in Debtor's confirmed Plan. The Court will resolve the remaining disputed terms and conditions where the Plan is silent as is necessary for consummation of the Plan.

Each party submitted drafts of the documents they respectively wish to employ. Debtor's documents were dramatically different from those of the Bank, not in the sense that they are not fair, workable, and professionally drafted, but in the sense that the Bank's preferred forms are uniformly used and familiar to it. The Bank urges that its

"standard forms" be adopted, and while I reject the notion that they must be employed without change, I do agree that what it represents to be its standard forms is the better starting point for an item-by-item ruling.

Initially there were a dozen or more terms and provisions that the parties seemed intractably at odds over. As negotiations progressed and pre-trial conferences occurred, the parties, to their credit, narrowed the issues to four. The parties collaborated, drafted, and delivered to the Court an annotated version of the Commercial Promissory Note (the "Note"). A copy of that document is attached to this Order as Exhibit A. It illustrates the remaining issues with this explanatory note.

> All highlighted language herein is contested by the Debtor. All other terms of this Note have been negotiated and agreed to by the Debtor and Bank. All footnotes contained in this version of the note are not in the "clean" version of the note, and are inserted in this version to provide the alternate language or alteration requested by the Debtor, in an attempt to highlight for the Court all issues remaining for adjudication. The footnotes are not intended to reargue the issues on the merits.

Exh. A, pg. 1. The first issue highlighted in the document relates to the provision entitled "Late Payment Charge."[1]

---

[1] In each instance, the language from Debtor's footnotes providing the alternate language or alteration requested by Debtor appears in parentheses and in italics after the Bank's original version.

LATE PAYMENT CHARGE. If any required payment is more than 10 days late, then at Lender's option, Lender will assess a late payment charge of 5.000% of the amount of the regularly scheduled payment then past due, subject to a maximum charge of $100.00 and a minimum charge of $5.00. (*Debtor requests that the highlighted language be deleted and replaced with "Borrower shall have a ten (10) day grace period. In the event Borrower fails to make a payment within the grace period,...*).

Exh. A, pg. 2, ¶ LATE PAYMENT CHARGE.

Ameris objects to the suggestion that a "grace period" for payments be imposed on it. Debtor insists that there should be a period during which no default can be declared. Debtor proposes that a grace period, matching the time frame during which no late payment fee is assessed, be inserted to protect it from a technical default. Because of the tortured history between the parties, Debtor feels itself at risk if a nominal delay in receipt of payment occurs, even if the cause is out of Debtor's control, for example, a delay in the mail service. I agree with Debtor. While it seems highly unlikely that Ameris would act in the event of a very short delay, it is possible; therefore, I find that the grace period language suggested by Debtor shall be included in the final Note.

The remaining issues arise in the paragraph entitled "Events of Default."

EVENTS OF DEFAULT. The occurrence of any one of the following events (each an 'Event of Default' or a

'Default') shall constitute an Event of Default:

(c)     the death, dissolution, or termination of existence of Borrower <mark>or any Guarantor</mark>; (*Delete the highlighted text*).

Exh. A, pg. 4, ¶ c.

A similar provision was part of the Darby Note. Debtor contends however that this is overreaching by Ameris. Because both guarantors have considerable business acumen, and because at any time Debtor's owners could replace the current manager, who is also a guarantor, with professional management at a rate comparable to that of insider compensation, Debtor contends that the death of a guarantor would not *ipso facto* place Ameris at risk.

There is some evidence to support this argument.  On the other hand, Ameris, like any lender, will have some justifiable concern if the person most involved in the day-to-day operation of the business is incapable of continuing his or her duties. The dedication and exertion that a founder is willing to invest into a business often transcends the degree of effort and sacrifice that a non-owner manager will devote to the same task. That is an intangible benefit to a lender of some consequence.  Here, however, that factor is offset by the presence of two co-owners/guarantors who share the expertise, knowledge, and motivation that supply that benefit. If, tragically, both guarantors pass away while this Note is still in effect, Ameris' point has considerably more power.  On balance, I conclude that the

event of default that relates to guarantors should be triggered only by the death of both guarantors.

Notwithstanding the foregoing, other Events of Default provisions, particularly the Material Adverse Change provision discussed *infra*, remain applicable throughout, regardless of whether Paragraph (c) is ever triggered.

> (g)     any tax lien, levy, writ of attachment, garnishment, execution, or similar item is or will be issued against the Collateral or which undischarged, unbounded, or undismissed for <mark>thirty</mark> days after it was issued; (*Replace "thirty" with "ninety"*).

Exh. A, pg. 4, ¶ g.

Debtor's expert's testimony that in some cases he has experienced delays in excess of thirty days by governmental officials in clearing up disputes over tax compliance was persuasive; therefore, I rule that the ninety day period is reasonable and shall be incorporated into the Note.

> (j)     <mark>if there has been a material adverse change of condition of the financial prospects of Borrower or any Collateral</mark>. (*Delete highlighted text*).

Exh. A, pg. 4, ¶ j.

First, it is important to set out the similar terms that were part of the original Darby Note. It reads in relevant part:

> **Adverse Change**. A material adverse change occurs in Borrower's financial condition, or Lender believes the prospect of payment or performance of this Note is impaired.
>
> **Insecurity**. Lender in good faith believes itself insecure.

Promissory Note, Claim No. 4, Exh. A, pg. 1. The Adverse Change language in the proposed Note is similar to that of the Darby Note. However, the proposed Note deletes the "Insecurity" clause in its entirety. Debtor is concerned that the Adverse Change language as written may grant unfettered discretion to Ameris to declare Debtor in default based on a change in its situation that the Bank subjectively considers to be materially adverse. There is no evidence to presume that Ameris would behave in this manner, but given the troubled history between the parties, I find that the proposed language should be qualified with a standard of "reasonable belief" or "in good faith." Indeed, this qualification is consistent with the parameters of the "Insecurity" clause of the Darby Note. Therefore, the provision shall be amended to read:

> (j)   Lender reasonably believes there has been a material adverse change of condition of the financial prospects of Borrower or any Collateral.

The final issue argued at the hearing in this matter was Debtor's principal,

Ben Farmer's, objection to inclusion of the phrase "without duress" in the "Agreement of Guarantors" portion of the Note. The provision reads:

> Each Guarantor hereto (i) acknowledges reading and understanding this Note; (ii) consents to the execution, delivery and performance of this Note as a renewal of a portion of the indebtedness evidenced by Note 1588760, dated August 3, 2009 and executed by Borrower in favor of Darby Bank, in the initial principal amount of $5,920,371.00; (iii) ratifies and affirms all of his or her obligations under the original guaranty executed by such Guarantor dated August 3, 2009, as subject to the terms of the Fourth Amended Plan of Arrangement as confirmed in the Farmers Chapter 11 Case (as defined herein); (iv) agrees to furnish the Financial Statements to Lender as set forth herein; (v) agrees to those portions of this Note that apply to the Guarantors; and (vi) acknowledges that this Note has been freely executed *without duress* and after an opportunity to consult with counsel.

Exh. A, pg. 7 (emphasis added).

Considerable attention was devoted to this issue at the hearing. Ameris insisted that this phrase was necessary to ensure that no defense of duress could later be asserted if it had to enforce the Note. The Court had significant concern that ordering the "without duress" phrase to be retained and forcing Mr. Farmer to sign the Note in light of the concerns he expressed would be coercive. Mr. Farmer's testimony on this point established the intense stress and financial pressure he has experienced. He described his state of mind as one of extreme duress. Yet, he stated that he would sign the Note as drafted if the Court

so required. Ameris, of course, wanted to erase any possibility that Mr. Farmer could later claim duress as vitiating his obligations.

The hearing concluded without any resolution of this impasse. However, on February 5, 2014, Debtor's counsel filed an affidavit from Mr. Farmer. Dckt. No. 277. In it he acknowledges that he misunderstood the legal implications of a claim of duress and now is agreeable to inclusion of the phrase "without duress" after consultation with his attorney.[2] *Id*. This affidavit essentially ends the matter, but because the testimony viewed alone could be construed differently, I find it incumbent to examine whether Mr. Farmer's earlier testimony fairly raises any issue of duress.

From his testimony and the history of this case, it is clear that Mr. Farmer has faced a financial crisis of immense proportions. He and Mrs. Farmer have navigated this case and their personal case, both of which have been difficult and contested throughout. This clearly would cause any reasonable person to experience an extreme amount of stress, which a layperson might equate with duress. However, the legal concept of duress, which

---

[2] In an email to the Court and opposing counsel preceding the filing of Mr. Farmer's affidavit, Debtor's counsel stated:

> I have informed Mr. Northup this morning, and wanted to inform Judge Davis, that Mr. Farmer has informed me that after reflection and further insight he no longer believes he would be executing the Note under duress and does not oppose the "without duress" the [sic] language in the Agreement of Guarantors. He believes his position was based on a his [sic] misunderstanding of the legal definition of "duress". Therefore, the last issue raised in court by the Debtor/Borrower (deletion of the term "without duress") is no longer an issue. I will provide a document to the Court with Mr. Farmer's signature indicating as such shortly.

could constitute a contractual defense, is quite different and requires much more.

Duress is codified under O.C.G.A. § 13-5-6, which states:

Since the free assent of the parties is essential to a valid contract, duress, either by imprisonment, threats, or other acts, *by which the free will of the party* is restrained and his consent induced, renders the contract voidable at the election of the injured party. Legal imprisonment, if not used for illegal purposes, does not constitute duress. (Emphasis added).

The Georgia Court of Appeals has held,

[u]nder Georgia law, duress consists of imprisonment, threats, or other acts, by which the free will of the party is restrained and his consent induced. "Business compulsion" or "economic duress" involves the taking of undue or unjust advantage of a person's economic necessity or distress to coerce him into making a contract and is recognized as a contractual defense. A duress claim must be based on acts or conduct of the opposing party which are wrongful or unlawful. Georgia courts are reluctant to void contracts, and we have found no Georgia decision voiding a contract on the theory of economic duress. And, in any event, when the signer of an agreement is sophisticated in business matters and has access to and in fact obtains advice of counsel, the defense of duress is not available to void the contract.

Compris Techs., Inc. v. Techwerks, Inc., 274 Ga.App. 673, 682, 618 S.E.2d 664 (2005)(emphasis omitted)(*quoting* Cooperative Resource Center, Inc. v. Southeast Rural Assistance Project, Inc., 256 Ga.App. 719, 720-21, 569 S.E.2d 545 (2002)). Because there

has been no evidence of wrongful or unlawful conduct, imprisonment, threats, or any other acts of that nature, clearly, the stress Mr. Farmer is feeling falls outside the scope of legal "duress." At trial Mr. Farmer testified that he could not agree to the inclusion of the phrase "without duress" in the Note because of the adversarial relationship he has with the Bank. He further stated that the parties have been fighting over this language for months, and he felt missing the significance of every term in the Note could be detrimental to him.  Certainly no one envies Debtor's bargaining position, being in Chapter 11 and owing $6,000,000 to Ameris on a secured claim; however, "[o]ne may not void a contract on grounds of duress merely because he entered into it with reluctance, the contract is very disadvantageous to him, the bargaining power of the parties was unequal or there was some unfairness in the negotiations preceding the agreement." Tidwell v. Critz, 248 Ga. 201, 204, 282 S.E.2d 104 (1981)(citation omitted)(internal quotation marks omitted); *see also* Chouinard v. Chouinard, 568 F.2d 430, 434 (5th Cir. 1978)("[T]he mere fact that a person enters into a contract as a result of the pressure of business circumstances, financial embarrassment, or economic necessity is not sufficient [to establish economic duress].").

To establish a claim for economic duress, Debtor must show that the acts or conducts of Ameris were wrongful or illegal. Frame v. Booth, Wade & Campbell, 238 Ga.App. 428, 429, 519 S.E.2d 237 (1999)("[An economic] duress claim . . . must be based upon acts or conducts of the opposite party which are wrongful or unlawful").[3] This standard

---

[3] The Frame Court acknowledged that an earlier decision of the Georgia Court of Appeals recognized "economic duress" as a form of duress but stated that it "[had] found no Georgia decision voiding a contract under this theory." Frame v. Booth, Wade & Campbell, 238 Ga.App. 428, 430, n.1, 519 S.E.2d 237 (1999).

has not been met under the evidence before me. Ameris' driving a hard bargain and insisting that Debtor, which owes $6,000,000, accept certain terms, conditions, and boilerplate material of its standard commercial loan documents can hardly be classified as wrongful or illegal conduct. Disregarding Mr. Farmer's current financial situation and the adversarial nature of the parties' relationship, it is certainly conceivable that if Mr. Farmer sought a comparable loan today from Ameris or any other bank, he would be required to accept terms and conditions similar to those Ameris is now requesting.

Finally, Mr. Farmer testified that he has been in business for over forty years. With such vast experience, I find that Mr. Farmer is sophisticated in business matters. He has obtained the advice of skillful, experienced, and competent counsel and financial professionals.   Accordingly, because Mr. Farmer has now, after consultation with his counsel, agreed that his concept of "duress" was legally imperfect and that the phrase can properly be included in the Note, and because on the merits I independently find that the circumstances do not amount to "duress," I conclude that the phrase shall be included in the Note.

 O R D E R

Pursuant to the foregoing Findings of Fact and Conclusions of Law, it is the ORDER of this Court that Ameris amend the Note to incorporate the changes as set forth herein. Once the Note is amended, it is further ORDERED that Debtor and Ameris execute

the Note within a reasonable period of time, not to exceed fourteen (14) days from the date the amended Note is presented to Debtor.

_____
Lamar W. Davis, Jr.
United States Bankruptcy Judge

Dated at Savannah, Georgia

This _____ day of March, 2014.

All highlighted language herein is contested by the Debtor.  All other terms of this Note have been negotiated and agreed to by the Debtor and Bank.  All footnotes contained in this version of the note are not in the "clean" version of the note, and are inserted in this version to provide the alternate language or alteration requested by the Debtor, in an attempt to highlight for the Court all issues remaining for adjudication.  The footnotes are not intended to reargue the issues on the merits.

**COMMERCIAL PROMISSORY NOTE**

**Ameris Bank**
**107 Southern Blvd., Suite 203**
**Savannah, Georgia  31405**
**(912) 238-1074**

| LOAN NUMBER | NOTE DATE | PRINCIPAL AMT | MATURITY DATE | TRANSACTION KEY | PROCESSOR |
|---|---|---|---|---|---|
| 1588760-801 | August 14, 2013 | $6,000,000.00 | August 6, 2018 | 15128 | hwhitehead |

**LOAN PURPOSE:** Partially renew loan number 1588760-1 originally to fund construction of a self storage facility.

**BORROWER INFORMATION**

CHATHAM PARKWAY SELF STORAGE, LLC
1669 Chatham Parkway
Savannah, GA  31405

**Type of Entity:**     Limited Liability Company
**State of Organization/Formation:**     Georgia

**GUARANTOR INFORMATION**

BEN G. FARMER
1 Modena Island Drive
Savannah, GA  31411

**Type of Entity:**     Individual
**State of Residence:**     Georgia

JULIE T. FARMER
1 Modena Island Drive
Savannah, GA  31411

**Type of Entity:**     Individual
**State of Residence:**     Georgia

---

**DEFINITIONS.**  These definitions are used in this Note.

    **Borrower.**  "Borrower" means Chatham Parkway Self Storage, LLC.

    **CPSS Chapter 11 Case.**  The "CPSS Chapter 11 Case" means that certain bankruptcy case styled In re: Chatham Parkway Self Storage, LLC, Case No. 12-42153-LWD, pending in the U.S. Bankruptcy Court for the Southern District of Georgia, Savannah Division.

    **Collateral.**  "Collateral" means the property that Borrower may or may have pledged, mortgaged, or given Lender a security interest in to secure the Indebtedness, regardless of where the property is located and regardless of when it was or will be acquired, together with all replacements, substitutions, proceeds, and products of the property.

    **Farmers Chapter 11 Case.**  The "Farmers Chapter 11 Case" means that certain bankruptcy case styled In re: Ben G. Farmer and Julie T. Farmer, Case No. 12-42154-LWD, pending in the U.S. Bankruptcy Court for the Southern District of Georgia, Savannah Division.

    **Financial Statements.**  "Financial Statements" means the balance sheets, earnings statements, and other financial information that any party has, is, or will be giving to Lender pursuant to the terms hereof.

    **Guarantors.**  "Guarantor" shall mean each of Ben G. Farmer and Julie T. Farmer (collectively, "Guarantors").

    **Indebtedness.**  "Indebtedness" means the Loan and all other loans and indebtedness of Borrower to Lender, including but not limited to Lender's payments of insurance or taxes, all amounts Lender pays to protect its interest in the Collateral, overdrafts in deposit accounts with Lender, and all other indebtedness, obligations, and liabilities of Borrower to Lender, whether matured or unmatured, liquidated or unliquidated, direct or indirect, absolute or contingent, joint or several, due or to become due, now existing or hereafter arising.

    **Lender.**  "Lender" means Ameris Bank, as Successor in Interest of Darby Bank & Trust ("Darby Bank"), whose address is 107 Southern Blvd., Suite 203, Savannah, Georgia 31405, its successors and assigns.

    **Loan.**  "Loan" means Loan Number 1588760-801, with a principal amount of $6,000,000.00, and any and all future amendments, modifications, extensions and renewals thereof.

    **Note.**  This Commercial Promissory Note will be referred to in this document as the "Note."

    **Original Note.**  "Original Note" means that certain Promissory Note with number 1588760, dated August 3, 2009, executed by Borrower in favor of Darby Bank in the initial principal amount of $5,920,371.00, as modified, extended or renewed prior to this Note, and as

*Exhibit "A" to Opinion and Order dated March 3, 2014 (consists of 7 pages)*
*In re:  Chatham Parkway Self Storage, LLC, Case Number 12-42153*

assigned to Lender pursuant to that certain Assignment dated October 3, 2012, by and between Lender and the Federal Deposit Insurance Corporation (the "FDIC") as receiver for Darby Bank, recorded October 4, 2012 in Book 381J, Page 745, Chatham County, GA real estate records.

**Plan.** The "Plan" shall mean that certain Second Amended Plan of Arrangement filed in the CPSS Chapter 11 Case, as confirmed by the U.S. Bankruptcy Court for the Southern District of Georgia by order entered July 23, 2013.

**Related Documents.** "Related Documents" means all promissory notes, security agreements, deeds to secure debt, loan agreements, resolutions, guaranties, environmental agreements, subordination agreements, assignments and any other documents or agreements executed in connection with this Note, the Original Note, the Security Deed, or any other documents evidencing or securing the Indebtedness, whether now or hereafter existing, including any modifications, extensions, substitutions, or renewals of any of the foregoing. The term "Related Documents" shall also include the Plan. Notwithstanding anything to the contrary in any Related Document, the terms of this Note shall control when in conflict with any such Related Document. Excepting any conflicting provisions of this Note and any Related Documents, the Related Documents are hereby made a part of this Note by reference thereto, with the same force and effect as if fully set forth herein.

**Security Deed.** "Security Deed" means that certain Security Deed executed by Borrower in favor of Darby Bank dated May 18, 2007 and recorded May 31, 2007 in Deed Book 326-L, Page 486 et seq., Chatham County, Georgia real estate records, evidencing a lien on the property located at 1669 Chatham Parkway; as modified by that certain Modification of Security Deed dated March 12, 2008 and recorded March 24, 2008 in Book 338-X, Page 788 et seq., Chatham County, Georgia real estate records; as further modified by that certain Modification of Security Deed dated April 15, 2009 and recorded June 4, 2009 in Book 352-A, Page 47 et seq., Chatham County, Georgia real estate records; as further modified by that certain Modification of Security Deed dated August 3, 2009 and recorded August 18, 2009 in Book 354-N, Page 308 et seq., Chatham County, Georgia real estate records; all such documents as assigned by the FDIC, as receiver for Darby Bank, to Lender by virtue of that certain Assignment dated October 3, 2012 and recorded October 4, 2012 in Book 381-J, Page 745, Chatham County, Georgia real estate records.

**PROMISE TO PAY.** For value received, receipt of which is hereby acknowledged, on demand by Lender in the event of an uncured default under the terms of this Note, or if no demand is made, on or before the Maturity Date, Borrower promises to pay, according to the payment schedule set forth herein, the principal amount of Six Million and No/100 Dollars ($6,000,000.00) and all interest on the outstanding principal balance and any other charges, including service charges, to the order of Lender at its office at the address noted above or at such other place as Lender may designate in writing. Borrower will make all payments in lawful money of the United States of America.

**PAYMENT SCHEDULE.** This Note will be paid according to the following schedules: The first payment schedule will consist of 12 monthly interest-only payments in the amount of Twenty Thousand and No/100 Dollars ($20,000.00) each, representing interest accruing on the principal indebtedness at a fixed rate of 4.000% per annum. Such monthly interest-only payments shall begin on September 6, 2013, with all subsequent interest payments to be due on the same day of each successive month thereafter, through and including August 6, 2014. The second payment schedule will consist of 48 fixed monthly payments of principal and interest, beginning on September 6, 2014 and due on the same day of each successive month thereafter, through and including August 6, 2018. The fixed monthly payments shall be calculated based on a 300 month amortization of the principal indebtedness beginning on September 6, 2014, at a fixed interest rate to be determined as (i) the prime rate as reported in the Wall Street Journal ("Wall Street Prime") as of August 6, 2014, plus (ii) 1.000%. The unpaid principal balance of this Note, together with all accrued interest and charges owing in connection therewith, shall be due and payable at the Note's maturity on August 6, 2018 (the "Maturity Date"). All payments received by Lender from Borrower for application to this Note will be applied first to any outstanding charges, then to accrued unpaid interest, and then to the unpaid principal balance; provided, that if Borrower is in default under the terms of this Note, then any payments received by Lender may be applied to Borrower's obligations under this Note in such order as determined by Lender, subject to Borrower's right to cure such default as set forth herein.

**INTEREST RATE AND SCHEDULED PAYMENT CHANGES.** Interest will begin to accrue on the date of this Note. The interest rate on this Note will be fixed at 4.000% per annum from the date of this Note through and including August 5, 2014. From August 6, 2014 through and including the Maturity Date, the per annum interest rate on this Note will be equal to (i) Wall Street Prime as of August 6, 2014, plus (ii) 1.000%.

Nothing contained herein shall be construed as to require Borrower to pay interest at a greater rate than the maximum allowed by law. If, however, from any circumstances, Borrower pays interest at a greater rate than the maximum allowed by law, the obligation to be fulfilled will be reduced to an amount computed at the highest rate of interest permissible under applicable law and if, for any reason whatsoever, Lender ever receives interest in an amount which would be deemed unlawful under applicable law, such interest shall be automatically applied to amounts owed, in Lender's sole discretion, or as otherwise allowed by applicable law. Interest on this Note is calculated on an **Actual/360** day basis. This calculation method results in a higher effective interest rate than the numeric interest rate stated in this Note. The unpaid balance of this Loan after maturity, whether by acceleration or otherwise, shall be subject to a post-maturity rate of interest equal to 16.000% per annum.

**LATE PAYMENT CHARGE.** <mark>If any required payment is more than 10 days late[1]</mark>, then at Lender's option, Lender will assess a late payment charge of 5.000% of the amount of the regularly scheduled payment then past due, subject to a maximum charge of $100.00 and a minimum charge of $5.00.

**PREPAYMENT PENALTY.** This Note may be prepaid, in full or in part, at any time, without penalty.

**SECURITY TO NOTE.** The Loan evidenced by this Note shall continue to be secured by the same Collateral which currently secures the Indebtedness, as evidenced by, *inter alia*, the following security document(s):

---

[1] Debtor requests that the highlighted language be deleted and replaced with "Borrower shall have a ten (10) ten day grace period. In the event Borrower fails to make a payment within the grace period,…"

- Security Deed executed by Borrower in favor of Darby Bank dated May 18, 2007 and recorded May 31, 2007 in Deed Book 326-L, Page 486 et seq., Chatham County, Georgia real estate records, evidencing a lien on the property located at 1669 Chatham Parkway; as modified by that certain Modification of Security Deed dated March 12, 2008 and recorded March 24, 2008 in Book 338-X, Page 788 et seq., Chatham County, Georgia real estate records; as further modified by that certain Modification of Security Deed dated April 15, 2009 and recorded June 4, 2009 in Book 352-A, Page 47 et seq., Chatham County, Georgia real estate records; as further modified by that certain Modification of Security Deed dated August 3, 2009 and recorded August 18, 2009 in Book 354-N, Page 308 et seq., Chatham County, Georgia real estate records; all such documents as assigned by the FDIC, as receiver for Darby Bank, to Lender by virtue of that certain Assignment dated October 3, 2012 and recorded October 4, 2012 in Book 381-J, Page 745, Chatham County, Georgia real estate records; and

- Commercial Security Agreement dated November 24, 2009, evidencing a security interest in all rents, leases, equipment, inventory, accounts receivable and proceeds of Borrower, as perfected by UCC Financing Statement recorded December 16, 2009 in Book 3570, Page 710, Chatham County, Georgia.

**GUARANTIES.**  All Indebtedness of Borrower to Lender is guaranteed jointly and severally by Ben G. Farmer and Julie T. Farmer, by virtue of commercial guaranties executed by such persons, each dated August 3, 2009 (each a "Guaranty" and collectively, the "Guaranties").  The Guaranties remain in full force and effect.  As Indebtedness of Borrower to Lender, the amounts evidenced by this Note are guaranteed by Ben G. Farmer and Julie T. Farmer, subject to the terms of any confirmed plan(s) of reorganization in the CPSS Chapter 11 Case and/or the Farmers Chapter 11 Case.

**BORROWER'S REPRESENTATIONS AND WARRANTIES.**  The statements made in this section will continue and remain in effect until all of the Indebtedness is fully paid to Lender.  Each Borrower represents and warrants to Lender the following:

> **Borrower's Existence and Authority.**  Borrower is duly formed and in good standing under all laws governing Borrower and Borrower's business, and Borrower has the power and authority to execute this Note and to bind Borrower to the obligations created in this Note.

> **Financial Information and Filing.**  All Financial Statements provided to Lender will be prepared in accordance with generally accepted accounting principles, consistently applied, and fully and fairly present the financial condition of Borrower. Borrower has filed all federal, state, and local tax returns and other reports and filings required by law to be filed before the date of this Note and has paid all taxes, assessments, and other charges that are due and payable prior to the date of this Note, except as otherwise allowed by the terms of the Plan. Borrower does not know of any deficiency or additional assessment not disclosed by Borrower in the CPSS Chapter 11 Case.

> **Title and Encumbrances.**  Borrower has good title to all of Borrower's assets.  All encumbrances on any part of the Collateral were disclosed to Lender in writing prior to the date of this Note.

> **Compliance with General Law.**  Borrower is in compliance with and will conduct its business and use its assets in compliance with all laws, regulations, ordinances, directives, and orders of any level of governmental authority that has jurisdiction over Borrower, Borrower's business, or Borrower's assets.

> **Environmental Laws.**  Borrower is in compliance with all applicable laws and rules of federal, state, and local authorities affecting the environment, as all have been or are amended.

> **No Litigation / No Misrepresentations.**  Other than the CPSS Chapter 11 Case, the Farmers Chapter 11 Case, or any other proceeding pending as of the date of this Note (including but not limited to the case styled Ameris Bank v. Ben Farmer Realty, Inc., Case No. CV12-01582-WA, currently pending in the Superior Court of Chatham County, Georgia (the "Realty Case")), there are no existing or pending suits or proceedings before any court, government agency, arbitration panel, administrative tribunal, or other body, or threatened against Borrower that may result in any material adverse change in Borrower's business, property, or financial condition, and all representations and warranties in this Note and the Related Documents are true and correct and no material fact has been omitted.

**COVENANTS.**  On the date of this Note and continuing until the Indebtedness is repaid and Borrower's obligations are fully performed, Borrower covenants as follows:

> **Notices of Claims and Litigation / Notice of Adverse Events.**  Borrower will promptly notify Lender in writing of all threatened and actual litigation, governmental proceeding, default, and every other occurrence that may have a material adverse effect on Borrower's business, financial condition, or the Collateral.

> **Insurance.**  Borrower will maintain adequate fire and extended risk insurance coverage, business interruption, commercial general liability, and other insurance required by law.  All insurance policies will be in amounts, upon terms, and in a form acceptable to Lender.  All policies must be carried with insurers acceptable to Lender.  Borrower will provide evidence satisfactory to Lender of all insurance and that the policies are in full force and effect and all insurance on the Collateral will name Lender as a mortgagee and loss payee, will include a lender's loss payable endorsement, and will require 10 days advance written notice to Lender of any cancellation of coverage.  If Borrower fails to maintain required insurance, the absence of the required insurance will be an Event of Default.  If this happens, Lender may buy the insurance but will have no obligation to buy it.  These amounts paid by Lender will be added to the Indebtedness or will be payable on demand, at Lender's option.

> **Payment of Taxes.**  Borrower will pay all taxes, levies, and assessments required by all local, state, and federal agencies.  Borrower will make these payments when the amounts are due but before any penalty for late payment is imposed.  Borrower's failure to promptly pay any tax, levy, or assessment due will be an Event of Default unless Borrower is diligently disputing the amount and Borrower has established a reserve account for the payment of the taxes if Borrower does not prevail in the dispute.

**Environmental Compliance.** Borrower will comply with all laws affecting the environment. Borrower will notify Lender within ten (10) days after Borrower receives a summons, notice, citation, letter, or any other type of notice from any federal, state, or local authority, or any other person that claims Borrower is in violation of any law affecting the environment. Borrower indemnifies and holds Lender harmless from all violations of any environmental laws. This indemnity includes all costs and expenses incurred by Lender, including reasonable attorneys' fees, that are related to a violation of any environmental laws, even if the Indebtedness has been paid at the time any proceeding, claim, or action is started against Lender. Lender may itself or through Borrower arrange for an environmental audit prepared by a qualified environmental engineering firm acceptable to Lender to confirm the continued accuracy of Borrower's environmental representations and warranties. Borrower will pay for the environmental audit.

**Use of Proceeds.** Partial renewal of Loan.

**No Borrowings, Guarantees, or Loans.** Borrower will not lend any money or sell any of Borrower's accounts receivable without Lender's prior written permission.

**No Encumbrances or Transfer of Assets.** Borrower will not mortgage, assign, hypothecate, or encumber any of the Collateral except to Lender without Lender's prior written permission. Borrower will not sell, transfer, or assign any of the Collateral without Lender's prior written permission. Borrower will not merge, consolidate, sell transfer, license, encumber or otherwise dispose of the Collateral or Borrower's business.

**Other Information.** From the date hereof until the Indebtedness is fully repaid and all of Borrower's obligations are fully performed and satisfied, Borrower and each Guarantor agrees, unless otherwise consented to in writing by Lender, that they will submit the following:

CHATHAM PARKWAY SELF STORAGE, LLC –
    i.    Federal and state tax returns, to be delivered to Lender within 30 days after the due date therefor as determined by applicable tax law (including any extension of such due date permitted by law); ***provided,*** that if an extension for any such tax return is filed, a copy of such extension shall be delivered to Lender within 30 days of filing.
    ii.    Financial Statements, including an income statement, a balance sheet and site inspection reports, to be delivered to Lender within 30 days of the end of each calendar quarter. Each such Financial Statement shall have all financial figures broken down by month.

BEN G. FARMER and JULIE T. FARMER –
    i.    Federal and state tax returns, to be delivered to Lender within 30 days after the due date therefor as determined by applicable tax law (including any extension of such due date permitted by law); ***provided,*** that if an extension for any such tax return is filed, a copy of such extension shall be delivered to Lender within 30 days of filing.
    ii.    An annual personal financial statement in form acceptable to Lender, to be delivered within 30 days after the end of each calendar year.

**EVENTS OF DEFAULT.** The occurrence of any one of the following events (each an "Event of Default" or a "Default") shall constitute an Event of Default:
    a)    Borrower's failure to make any payment on time or in the amount due;
    b)    any default by Borrower under the terms of this Note or any other Related Documents;
    c)    the death, dissolution, or termination of existence of Borrower or any Guarantor[2];
    d)    the commencement of any proceeding under bankruptcy or insolvency laws by or against Borrower or any Guarantor (other than the CPSS Chapter 11 Case, the Farmers Chapter 11 Case, or any other such proceeding pending as of the date of this Note), or the appointment of a receiver for Borrower or any Guarantor;
    e)    any writ of attachment, garnishment, execution, tax lien or similar instrument that materially affects the Borrower is issued against any of the Collateral;
    f)    any judgment is entered against Borrower that materially affects that party's business, financial condition, or the Collateral;
    g)    any tax lien, levy, writ of attachment, garnishment, execution, or similar item is or will be issued against the Collateral or which materially affects Borrower's business, financial condition, or the Collateral, and which remains unpaid, unstayed on appeal, undischarged, unbounded, or undismissed for thirty[3] days after it was issued;
    h)    any representation or warranty made by Borrower to Lender in any of the Related Documents or any Financial Statement delivered to Lender proves to have been false in any material respect as of the time when made or given;
    i)    if any Guarantor, or any other party to any Related Documents terminates, attempts to terminate or defaults under any such Related Documents;
    j)    if there has been a material adverse change of condition of the financial prospects of Borrower or any Collateral.[4]

Notwithstanding the foregoing, a default by Borrower or any joint obligors, co-borrowers or Guarantors of or with Borrower of any such party's obligations (i) to Lender other than those set forth in this Note or any other Related Documents, or (ii) to any third party, shall not constitute a default by Borrower of its obligations under this Note or such other Related Documents. **Further notwithstanding the foregoing,**

---

[2] **Delete the highlighted text.**

[3] **Replace "thirty" with "ninety".**

[4] **Delete highlighted text.**

any act, event, occurrence or failure to act that would otherwise constitute an Event of Default as set forth in subparagraphs (a) through (j) above shall not constitute an Event of Default under this Note if such Event of Default occurred prior to the date of this Note (an "Antecedent Default"). An Antecedent Default shall include, without limitation, the existence of the CPSS Chapter 11 Case, the Farmers Chapter 11 Case and the Realty Case, but shall not include any Event of Default, such as a payment default, occurring after the date of this Note, even though a similar default may have occurred separately and independently prior to the date of this Note. The exception for an Antecedent Default by Borrower or any guarantor shall prohibit only Lender's right to seek payment from Borrower under the terms of this Note, and shall not otherwise alter, reduce or eliminate Lender's right to seek payment under the terms of any other instruments from (i) Ben G. Farmer and/or Julie T. Farmer, subject to the terms of the Fourth Amended Plan of Arrangement as confirmed in the Farmers Chapter 11 Case; or (ii) Ben Farmer Realty, Inc.

**REMEDIES ON DEFAULT.** Upon the occurrence of an Event of Default and the failure to cure such default under the terms of this Note: (i) Lender's obligations, if any, to make any advances will, at Lender's option, immediately terminate and Lender, at its option, may declare all indebtedness of Borrower to Lender under this Note immediately due and payable without further notice of any kind notwithstanding anything to the contrary in this Note or any other agreement; and (ii) Lender may pursue any remedy available under any Related Document, at law or in equity.

**CURE PROVISIONS:** Any default, other than a default in payment, is curable and if Borrower has not been given a notice of default based on the same category of default within the preceding twelve (12) months, the default may be cured if Borrower, after Lender sends written notice to Borrower demanding cure of such default: (1) cures the default within thirty (30) days; or (2) if the cure requires more than thirty (30) days, immediately initiates steps which Lender deems in Lender's sole discretion to be sufficient to cure the default, and thereafter continues and completes all reasonable and necessary steps sufficient to produce compliance as soon as reasonably practical. A default in payment may be cured by Borrower at any time prior to the conclusion of a foreclosure sale by reinstating payments to Lender, provided that all actual costs of Lender are paid in full and all arrearages are brought current at such time. Borrower's right to cure a payment default as set forth herein shall not prevent Lender from initiating any action(s) necessary to exercise the remedies available to Lender under applicable law upon such default.

**RIGHT OF SET-OFF.** To the extent permitted by law, Borrower agrees that Lender has the right to set-off any amount due and payable under this Note, whether matured or unmatured, against any amount owing by Lender to Borrower including any or all of Borrower's accounts with Lender. This shall include all accounts Borrower holds jointly with someone else and all accounts Borrower may open in the future. Such right of set-off may be exercised by Lender against Borrower or against any assignee for the benefit of creditors, receiver or execution, judgment or attachment creditor of Borrower, or against anyone else claiming through or against Borrower or such assignee for the benefit of creditors, receiver, or execution, judgment or attachment creditor, notwithstanding the fact that such right of set-off has not been exercised by Lender prior to the making, filing or issuance or service upon Lender of, or of notice of, assignment for the benefit of creditors, appointment or application for the appointment of a receiver, or issuance of execution, subpoena or order or warrant. Lender will not be liable for the dishonor of any check when the dishonor occurs because Lender set off a debt against Borrower's account.

**PAYABLE ON DEMAND.** Apart from the monthly payments required by the terms of this Note, full payment of the unpaid principal balance of this Note, together with all accrued interest and charges owing in connection therewith, shall be due and payable only on the Maturity Date unless demanded earlier by Lender, which demand shall be made by Lender only upon an Event of Default as defined herein, subject to Borrower's right to cure as set forth herein.

**EXPENSES.** Borrower and the Guarantors agree to pay all of Lender's reasonable expenses incidental to perfecting Lender's security interests and liens, all insurance premiums, Uniform Commercial Code search fees, and all reasonable fees incurred by Lender for audits, inspection, and copying of the books and records of Borrower and any Guarantor. Such parties also agree to pay all reasonable costs and expenses of Lender in connection with the enforcement of Lender's rights and remedies under this Note, the Related Documents, and any other agreement between one or more parties and Lender.

**DISHONORED ITEM FEE.** If Borrower makes a payment on the Loan with a check or preauthorized charge which is later dishonored, a fee in the amount of $30.00 will be charged.

**ATTORNEYS' FEES AND OTHER COSTS.** If legal proceedings are instituted to enforce the terms of this Note, Borrower agrees to pay all costs of Lender, and actual attorneys' fees not to exceed fifteen percent (15%) of the principal and interest owing at the time the matter is referred to an attorney for enforcement.

**NOTICES.** All notices required under this Note must be in writing and will be considered given: (i) on the day of personal delivery; (ii) one business day after deposit with a nationally recognized overnight courier service; or (iii) three business days after deposit with the United States Postal Service sent certified mail, return receipt requested. Any of these methods may be used to give notice. All notices must be sent to the address for such party first set forth in this Note. Any party may change its address for notice purposes on five days' prior written notice to all other parties.

**GENERAL WAIVERS.** To the extent permitted by law, Borrower severally waives any required notice of presentment, demand, acceleration, intent to accelerate, protest and any other notice and defense due to extensions of time or other indulgence by Lender or to any substitution or release of Collateral. No failure or delay on the part of Lender, and no course of dealing between Borrower and Lender, shall operate as a waiver of such power or right, nor shall any single or partial exercise of any power or right preclude other or further exercise thereof or the exercise of any other power or right.

**FURTHER ACTION.** The parties hereto will, upon request of Lender, make execute, acknowledge, and deliver to Lender the modified and additional instruments, documents, and agreements, and will take the further action that is reasonably required, to carry out the intent and purpose of this transaction.

**JOINT AND SEVERAL LIABILITY.** If permitted by law, each Borrower and/or Guarantor executing this Note is jointly and severally bound.

**SEVERABILITY.**  If a court of competent jurisdiction determines any term or provision of this Note is invalid or prohibited by applicable law, that term or provision will be ineffective to the extent required.  Any term or provision that has been determined to be invalid or prohibited will be severed from the rest of this Note without invalidating the remainder of either the affected provision or this Note.

**SURVIVAL.**  The rights and privileges of Lender hereunder shall inure to the benefits of its successors and assigns, and this Note shall be binding on all heirs, executors, administrators, assigns and successors of Borrower and any Guarantor, as applicable.

**ASSIGNABILITY.**  Lender may assign, pledge or otherwise transfer this Note or any of its rights and powers under this Note without notice, with all or any of the obligations owing to Lender by Borrower, and in such event the assignee shall have the same rights as if originally named herein in place of Lender.  Borrower may not assign this Note or any benefit accruing to it hereunder without the express written consent of Lender.

**ORAL AGREEMENTS DISCLAIMER.**  This Note represents the final agreement between the parties and may not be contradicted by evidence of prior, contemporaneous or subsequent oral agreements of the parties.  There are no unwritten oral agreements between the parties.

**GOVERNING LAW.**  This Note is governed by the laws of the state of Georgia except to the extent that federal law controls.

**JURISDICTION.**  The parties hereto authorize any action brought to enforce the parties' obligations to be instituted and prosecuted in the Superior Court of Chatham County, Georgia or in the United States District Court for the Southern District of Georgia.  The parties hereto authorize Lender to elect the court in Lender's sole discretion.

**HEADING AND GENDER.**  The headings preceding text in this Note are for general convenience in identifying subject matter, but have no limiting impact on the text which follows any particular heading.  All words used in this Note shall be construed to be of such gender or number as the circumstances require.

**COUNTERPARTS.**  This Note may be executed by the parties using any number of copies of the Note.  All executed copies taken together will be treated as a single Note.

**TIME IS OF THE ESSENCE.**  Time is of the essence in the performance of this Note.

**RENEWAL NOTE AND REMAINING INDEBTEDNESS.**  This Note is a renewal of a portion of the indebtedness evidenced by the Original Note.  This partial renewal is undertaken in accordance with the terms of the Plan.  Accordingly, the remaining portion of the original indebtedness evidenced by the Original Note, plus any accrued interest and other amounts owing in connection therewith, remain payable by Borrower in accordance with the terms of the Original Note, subject to the terms of the Plan.  In addition, all Collateral securing the Indebtedness shall continue to secure the obligations of Borrower hereunder.

**ADDITIONAL PROVISIONS.**  Payments will be applied to the Loan as of the business day received, subject to the following requirements:

a.   Payment/Payoff is accompanied by correct account number or payment coupon.
b.   Payment/Payoff is received during normal operating hours on a day that is not an announced bank holiday.
c.   Payment/Payoff is received by mail by 5:00p.m. Eastern Time.
d.   Payment/Payoff sent by mail is required to be check or money orders only.
e.   Payment/Payoff is required to be in U.S. Dollars.
f.   Payment/Payoff is requested to be mailed to the Dothan Loan Service Center, 3299 Ross Clark Circle NW, Dothan, AL 36303-3039.
g.   Payment/Payoff left in the bank night drop is received the following working day when the vault is opened by bank personnel.

**PAYOFF REQUESTS.**  A customer may contact their loan officer to obtain a payoff at any time.  However, payoff requests that are to be sent to a third party must be in writing and signed by the customer.

**By signing this Note, Borrower acknowledges reading, understanding, and agreeing to all its provisions and receipt hereof.**

**BORROWER:**
CHATHAM PARKWAY SELF STORAGE, LLC


_____          Date          _____          Date
By:  BEN G. FARMER                                              By:  JULIE T. FARMER
Its:  Managing Member                                           Its:  Member/Secretary


**LENDER:**
AMERIS BANK


_____          Date
By:  PATRICK BRODMANN

Its:  VP, Special Assets Division

## AGREEMENT OF GUARANTORS

Each Guarantor hereto (i) acknowledges reading and understanding this Note; (ii) consents to the execution, delivery and performance of this Note as a renewal of a portion of the indebtedness evidenced by Note 1588760, dated August 3, 2009 and executed by Borrower in favor of Darby Bank, in the initial principal amount of $5,920,371.00; (iii) ratifies and affirms all of his or her obligations under the original guaranty executed by such Guarantor dated August 3, 2009, as subject to the terms of the Fourth Amended Plan of Arrangement as confirmed in the Farmers Chapter 11 Case (as defined herein); (iv) agrees to furnish the Financial Statements to Lender as set forth herein; (v) agrees to those portions of this Note that apply to the Guarantors; and (vi) acknowledges that this Note has been freely executed without duress and after an opportunity to consult with counsel.

**GUARANTOR:**                                              **GUARANTOR:**

_____ (L.S.)          _____ (L.S.)
BEN G. FARMER              Date                          JULIE T. FARMER              Date
Individually                                                      Individually